# OHIO NISI PRIUS REPORTS

## NEW SERIES—VOLUME XVIII.

CAUSES ARGUED AND DETERMINED IN THE SUPERIOR,
COMMON PLEAS, PROBATE AND INSOLVENCY
COURTS OF OHIO.

---

### CONSENTING FRONTAGE FOR A STREET RAILWAY ROUTE.

Superior Court of Cincinnati.

DAVID L. CARPENTER ET AL V. THE CINCINNATI TRACTION
COMPANY ET AL.

Decided, February 24, 1915.

*Municipal Corporations—Council Speaks Only Through its Records—Announcement of an Intention to Act—Not Equivalent to Action Carrying Out Such Intention—Invalidity of Street Railway Consents—Granted for Park Property on a Proposed Street.*

1. Where by ordinance a franchise is granted by a municipality for the extension of a street railroad partly over an existing street and partly over the same street "relocated," such relocation *to be* over private property which the municipality has taken no steps to acquire and also over property held by the municipality for park purposes, the consent of the municipality, as a *prospective* abutting owner, to such street railroad extension can not be counted towards the requisite majority of consenting property owners upon such street.

2. The declaration, in an ordinance authorizing an extension of a street railroad over a certain street, that a portion of the street in question is to be "relocated" between certain points, and that the street railroad extension is to be constructed over said street so to be relocated, is not a substitute for, or the equivalent of an

ordinance to "open, straighten, alter, or divert" such street as required by Section 3715, General Code, for the relocation thereof.

3. The consent of owners of a majority of the feet front abutting on a street along which a street railroad is proposed to be constructed, required by General Code, Sections 3770 and 9105, as a prerequisite to a street railroad grant, is the consent of owners of property abutting upon an *existing* street, and the statute is not satisfied by the *promised* consent of owners of property which will abut upon a *proposed* street, which has never been established by ordinance and the right-of-way for which has never been acquired by the municipality.

*Dinsmore & Shohl*, for plaintiffs.
*Walter M. Schoenle*, City Solicitor, for the City of Cincinnati.
*Joseph Wilby*, for the Cincinnati Street Railway Co.
*Robert Marx*, for the Cincinnati Traction Co.

MERRELL, J.

The plaintiffs are the owners of property abutting upon that part of Reading road comprised in the long block between Mitchell avenue on the south and Paddack road on the north. They charge that the defendants are about to tear up the street in front of their property and construct thereon street railway tracks with poles, trolley wires and other appliances accessory to a street railway. It is alleged that this construction is about to be entered into by the defendants in pursuance of a pretended ordinance by the city of Cincinnati authorizing the defendant railway companies to construct, maintain and operate an extension of the existing Avondale street railway route over and along that part of Reading road upon which plaintiff's properties abut, and thence by alternative routes to Bond Hill.

The construction of tracks necessary for this extended route is sought to be enjoined upon several grounds, of which one, and perhaps the chief one, is that the franchise ordinance is not supported by the consents of a majority of the property abutting upon the proposed route. It is admitted that the required majority of consents has not been obtained for that block of Reading road upon which plaintiff's properties abut, but it is contended that the consent of the city of Cincinnati given for city-owned property abutting on a proposed re-location of a

section of Reading road immediately to the north establishes a consenting majority of frontage upon the entire street.

Reading road, formerly an old turnpike road, is one of the chief arteries of travel from the center of Cincinnati to suburban districts.· This road is now occupied for a long distance by the double car tracks of what is known as the Avondale line. This Avondale line as at present constructed, leaves Reading road before it reaches the block upon which plaintiffs' properties abut and proceeds over Mitchell avenue, a road leading to the west from Reading road, the main direction of the latter being north and south.   Reading road itself from the point where it is intersected by Mitchell avenue continues in a northerly direction for the long block upon which the plaintiffs reside.   At the northerly terminus of this block Paddack road strikes off to the west for a short distance, turning then to the. north and passing through part of the suburb known as Bond Hill.   Reading road itself, as it has always been known, continues in a general northerly direction, but shortly after leaving its intersection with Paddack road makes a bend, swinging around the easterly side of the hill until it resumes a more or less straightaway course which the plat shows to be substantially a continuation of its course south of the Paddack road intersection.   The controversy in this case has to do with the proposed re-location or straightening of Reading road whereby in place of the bend or curve referred to and now existing, a straightaway course is laid northwardly from a point near the Paddack road intersection.   This straightaway course, which will be referred to as the re-location of Reading road, or the re-located portion of Reading road, does not now exist in the physical form of a roadway available for travel, but extends through property which as to its southern portion is now held in private ownership, and as to the northern and larger portion extends through park property of the city of Cincinnati, commonly known as Blachly Farms, or Avon Field.

On December 16th, 1913, the council of the city of Cincinnati passed an ordiance No. 711-1913, entitled an ordinance "authorizing the Cincinnati Street Railway Company and the Cincinnati Traction Company to construct, maintain and operate an

extension of the Avondale route over and along Reading road and California avenue, or Reading road and Paddack road." The California avenue referred to is one running west from Reading road in the suburb of Bond Hill and has no immediate connection with the controversy in this case. The ordinance, No. 711, is too long to be set out in full. By the first section of the ordinance the street railway companies are authorized to construct and operate an extension of the Avondale route over one of two courses set out. The first over Reading road from Mitchell avenue to Paddack road and thence over Paddack road (this route being referred to as the Paddack road route), the second starting from the intersection of Reading road and Mitchell avenue, thence north upon Reading road, including the re-located or widened portions as hereinafter described, to the intersection of Reading road and California avenue (this route being referred to as the Reading road route).

By Section 2 of the ordinance the street railway companies are required to accept the Paddack road route within thirty-five days, and within one hundred and twenty days thereafter file with council the required majority of consents of the owners of property abutting both upon Reading road and upon Paddack road. It is provided that upon the acceptance of the Paddack road route all rights to the Reading road route shall cease and determine. It is further provided:

"If within thirty-five days after the passage of this ordinance said companies file with the clerk of this council their written acceptance of this ordinance including all the terms and conditions thereof, and further file within one hundred and twenty days after the passage of this ordinance with the clerk of this council their written expression of their choice of said Reading road route then upon the filing of said acceptance and exercise of choice, all the rights, privileges and franchise to construct, maintain and operate said extension over said Paddack road route shall not go into force and effect and shall cease and determine and said extension shall be constructed, maintained and operated over said Reading road route."

It is agreed that the street railway companies have failed to take advantage of the option for the Paddack road route, and

that they have accepted the ordinance upon the alternative of the Reading road route. There is, therefore, at this time no franchise over Paddack road, and the only rights in the nature of a franchise are confined to the Reading road route.

By Section 3 of the ordinance it is provided that from

"a point not exceeding two hundred feet north of the north line of the intersection of Reading road and Paddack road (said point to be selected by the director of public service and approved by this council) and the intersection of Reading road and Blachly avenue, the said Reading road route shall not be located upon Reading road as at present located but upon Reading road re-located, so as to shorten and straighten same, said re-located portion of Reading road to be from said intersection of Reading and Paddack roads or said point on a tangent or approximately a tangent to the intersection of Reading road and Blatchly avenue."

By this description of Reading road re-located is meant the straightaway course which I have above described, cutting off that portion of the present road which curves around the hillside. It is in evidence that the re-location is 2100 feet long as against a length of 2650 feet for the corresponding portion of the existing roadway. The general line of the relocation provides a straightaway course and eliminates curves in the present roadway which it is agreed are dangerous to traffic. The following provisions of the ordinance are of special importance as they constitute the basis for the bringing of this suit at the time it was brought:

"The commencement of the work of construction of said extension along said Reading road route shall be within thirty days after the said shortening, straightening, re-locating and widening of Reading road at said two places shall have been commenced by the city."

At the hearing of this case it was apparently assumed by counsel for the plaintiffs and by the city solicitor that shortly before the bringing of this action the city had "commenced" the re-locating of Reading road, and that the street railway companies were therefore under obligation to commence their work of construction of the street railway extension within thirty

days.   Hence the plaintiffs sought to assert their rights by instituting this action.

The remaining provisions of the ordinance need not be set out or referred to, with the exception of the final section:

"Section 8.   Consent of the city of Cincinati is hereby given for any and all property of said city abutting or which may abut upon each and all of said streets; this consent being to the construction, maintenance and operation of the above described street railroad extensions in accordance with the provisions of this ordinance."

It is agreed that the frontage for which the city has undertaken to consent is greater than the frontage controlled by the plaintiffs.   Hence if the latter's property and that owned by the city be considered as abutting upon one and the same street, the street railway franchise over Reading road is supported by the requisite majority of consenting property owners.

The theory, as I understand it, of counsel for the city, is that by the provisions of the ordinance above set out in part, followed by the actions of the city authorities subsequent to the passage of the ordinance, the re-location of Reading road is in legal contemplation an established fact, and that hence the moment the city undertakes any work looking to the physical carrying out of re-location, the street railway companies are thereupon authorized to begin the laying of tracks, and, in fact, required to begin this work within thirty days.

It becomes necessary, therefore, to consider what action was taken by the city of Cincinnati through its council or other officials subsequent to the passage of the franchise ordinance concerning the same subject matter.   On July 15th, 1914, there was passed an ordinance providing for the issue of bonds in the sum of $60,000 "for the purpose of providing funds to pay the cost and expense of opening, extending and improving Reading road on its re-located lines," (north of Paddack road) "and purchasing and condemning the necessary land therefor."   The bonds thus provided were issued and sold and the money is in the treasury.   On November 17th, 1914, an ordinance was passed authorizing and directing the director of public service to make

expenditures for the improvement of·Reading road on its re-·. located line by constructing a culvert. In pursuance of this ordinance the director of public service advertised for bids for this culvert, received bids for the work at a figure in the neighborhood of $3,300, and rejected all bids. On March 10, .1914, the city engineer transmitted to council plans for the proposed re-located road. These plans were approved by council on April 21, 1914. On June 23rd, 1914, the engineer was requested to transmit to council an estimate for the work of relocation. This estimate was ordered filed by council July 15th, 1914. Within the present month, and long after this suit was filed, council directed (February 2d, 1915) that a plat and resolution be submitted showing property to be appropriated for the proposed re-location of Reading road.

The foregoing is a statement of the only action that has been officially taken by the city of Cincinnati, the city council or any public official. It appears in evidence, to be sure, that for the past six months the chief assistant engineer in charge of highways has been diligently engaged in making and revising plans and estimates for the proposed re-located road. These plans and estimates, however, are manifestly tentative only, and they have never been transmitted to council and, therefore, have not been acted upon or given any aspect of finality. At the hearing certain city officials were called, and it was offered to be shown on the part of the city, that these officials were genuinely intent upon carrying out the construction of the roadway. Manifestly, however, the opinions, intentions and policies of public officials are not the equivalent of official action which can alone be considered in the determination of the issues presented.

The record of the city as shown by its official action being such as has just been stated, the question presents itself at the threshold of this case whether the re-location of Reading road is an accomplished fact, or on the other hand, is a mere proposal hereafter to be carried out, in other words, a mere policy to which city council has committed itself. If the re-located por-. tion of Reading road be indeed an existing road at the present time, the action of the director of public service in calling for bids for some part of the work in contemplation, might con-

ceivably constitute a "commencement" of work in the phrase of the ordinance, and after such "commencement" the street railway companies are under obligation within thirty days to begin the work of extending tracks. Upon this theory the bringing of the present action by the plaintiffs is a timely assertion of whatever rights they may have. On the other hand, if upon the record, the re-location is a mere project of the city of Cincinnati as distinguished from an existing road, then the institution of this suit may turn out to be premature.

Referring to Section 3 of the franchise ordinance which deals with the subject of re-location, we find that

"said Reading road route shall not be located upon Reading road *as at present located,* but upon Reading road re-located, * * * said re-located portion of Reading road *to be* from said intersection of Reading and Paddack roads."

And later,

"such re-location, straightening or widening *to be* such as *will locate* said Reading road on a tangent."

And again it is provided that street railway work

"shall be begun not later than thirty days after such re-located, and straightened or widened portions *shall have been duly laid out and graded.*"

Considering nothing more than the above language employed in the ordinance, the inference is a natural, if not an inevitable one, that council did not assume by its action to re-locate Reading road, but merely signified its intention so to do. However, the interpretation of what was actually accomplished by the ordinance in question on the subject of re-location need not be left to the construction of the language used. The action requisite by council for the making, altering or straightening a public road is distinctly provided by Section 3715 of the Code of Ordinances, as follows:

"When it deems it necessary, the council may open, straighten, alter, divert, narrow or widen, any street, alley, or

public highway within the limits of this corporation. The council shall provide by ordinance therefor, which shall briefly and in general terms describe the part, if any, of the street, alley, or public highway to be abandoned by reason of such change thereof, and the property, if any, to be appropriated for such purposes. The proceeding for such appropriation shall be as provided for the appropriation of property for other municipal purposes in this title.''

By no process of construction however liberal, can it be said that the franchise ordinance for the Bond Hill extension is an ordinance to straighten, alter or divert Reading road or any part thereof. It is furthermore to be borne in mind that the proposed re-location traverses property part of which is still in private possession and part of which, so far as the evidence discloses, is held by the city of Cincinnati for park purposes. Even if proper steps have been taken to transfer what has hitherto been property held by the city of Cincinnati for park purposes and to vest the same in the city for road purposes—a fact which does not appear—no step whatever has been taken by the city to acquire a right of way for a roadway over private property. In order for the city to acquire the latter right, it is necessary for the present owners of the property in question to grant or dedicate the same to the city for a roadway, or for the city to take appropriate steps to acquire the property by process of eminent domain. No such steps have in fact been taken. It is entirely possible that the city council will refuse to pass the necessary resolution and ordinance to appropriate this property. Even if it be assumed that every individual member of council and every city official concerned is willing and desirous to take the action indicated, the situation is not changed in the slightest. The actions and even the intentions of a municipal corporation are those only which are evidenced by the *official* acts of the municipal legislature and public officials. A municipal council speaks by its records, and not by the intentions of its members individually expressed.

It will readily be seen from the foregoing record of official action on the part of the city council, that the latter has not committed the city with any finality to locate or re-locate

a road upon the lines proposed. True, the city, by the sale of bonds, has in its treasury $60,000 set aside for this purpose, but if council takes no further action to establish or re-locate the roadway in question, the only result will be that these funds will pass to the city's sinking fund to redeem the bonds.

It is, of course, true that a street may exist in legal contemplation, although its surface has never been prepared for public travel. It by no means follows, however, that a city council by its promise of future action, embodied in an ordinance granting a street railroad franchise, can create a street (or re-locate one) over property which the city does not own and which it has taken no steps to acquire.

It follows from what has been said that the so-called re-located portion of Reading road is not now a "street or public way" with reference to which an abutting owner may give his consent to the construction of a street railway. To be sure the city of Cincinnati has by Section 8 above quoted of the franchise ordinance, given its consent to the construction of street railway tracks over Reading road when re-located. Yet in view of the fact that the property as to which the city has consented abuts not upon a street or public way, but only upon a promised street, the so-called consent of the city is not a consent *in praesenti*, but merely a promise to consent when the proposed road is established.

The statute laws of this state provides in connection with the grant of street railway franchises as follows:

"Section 3770. No such grant shall be made, except to the corporation * * * that * * * shall have previously obtained the written consent of a majority of the property holders upon each street or part thereof, on the line of the proposed street railroad, represented by the feet front of the property abutting on the several streets along which such road is proposed to be constructed."

And

"Section 9105. No such grant shall be made until there is produced to council, or the commissioners, as the case may be, the written consent of the owners of more than one-half of the

feet front of the lots and *lands abutting on the street or public way*, along which it is proposed to construct such railway or extension thereof; and the provisions of all ordinances of the council relating thereto, have in all respects been complied with, whether the railway proposed is an extension of an old or the granting of a new route.''

This section contemplates beyond all doubt the existence of a ''street or public way'' before a consent with reference thereto is operative. Inasmuch therefore as the so-called re-location of Reading road is not now an existing ''street or public way'' the consent of the city as an abutting property owner is not such a consent as under the statute can be counted to make up a consenting majority of abutting frontage. It is admittted (subject to a qualification to be noticed later) that without the consents of the city of Cincinnati there have never existed and do not now exist sufficient consents to permit the laying of tracks for the Bond Hill extension on the Reading road route.

The present controversy must, therefore, be determined upon a single issue of fact. The so-called re-location of Reading road is a thing altogether of the future. It does not now exist for the purpose of computing consenting frontage upon Reading road. Upon the existing state of facts, therefore, the plaintiffs by refusing for their respective properties to consent to the street railway extension, have exercised an effective veto upon the laying of tracks and like construction in the street in front of their properties.

As this court is without jurisdiction to inquire into the purpose or animus of non-consenting abutters (*Traction Co.* v. *Parrish*, 67 O. S., 181; *Cleveland* v. *Railroad*, 3 C.C.(N.S.), 563, the conclusions already expressed are apparently sufficient for the drafting of the proper decree. However, the pleadings and evidence must again be adverted to.

The petition charges that ''the defendants'' (meaning doubtless the street railway companies) ''are now about to tear up the street in front of the property of the plaintiffs and construct thereon street railway tracks.'' Whether by inadvertence or otherwise, there was no proof, at the trial, that such action was impending or really threatened. In the joint answer of the

railway companies, "the Cincinnati Traction Company further admits that it intends to construct and operate said street railway line in accordance with the terms and conditions of said ordinance." This admission is not an admission of the threat charged in the petition, but is purely argumentative. If the defendants intend to proceed only "in accordance with the terms and conditions" of the ordinance, it may be doubted if they will proceed at all under the existing state of fact. Relief by injunction should not be granted, except to prevent damage to property rights that is real and imminent. I am of opinion, therefore, that the petition should be dismissed without prejudice to the re-assertion of plaintiffs' alleged rights upon a different state of facts. If, however, defendants' alleged threats can be shown by other evidence or by admission, the case will be re-opened for that purpose.

In reaching the conclusion thus indicated I have omitted one phase of the case which may be briefly dealt with. It is the admitted fact that eliminating from all consideration the "re-located" portion of Reading road, the proposed street railway extension will traverse a further section of the road as at present located (north of the re-located section); that property owners upon this northern section of Reading road have given consents in such amount as to produce a majority of consenting frontage upon *all* of Reading road, *excepting* the re-located portion. Counsel for the city contends that the requisite consents are thus shown. This contention can not be agreed to. The statute invoked by the plaintiffs contemplates as a prerequisite to street railroad construction, a majority of consenting frontage on each street to be occupied (*Cable Co.* v. *Neare,* 54 O. S., 153) and two remote sections of a street can not be counted as one for the purpose of imposing upon the abutters of one section of a street the will of those owning property upon another and distant section.

The allegations of the petition raise other issues, already indicated, of the gravest importance. Much of the oral argument and the able briefs of counsel deal with these issues. Thus it is urged that the "re-location" when made will not be a part of Reading road, but will be a new and independent street. A

re-location it is insisted, necessarily involves a vacation of the corresponding portion of the old street. Again it is contended upon the supposed analogy of *Carpenter* v. *Traction Co.*, 13 N.P.(N.S.), 81, that when the sole or predominant purpose of a "re-location" is to obtain the consents of prospective abutters to street railroad operation, and thereby out-vote non-consenting abutters upon neighboring portion of the same street, such proceeding is in legal contemplation "a sham and pretense," and ineffective for the purpose.

It is well understood that a judicial determination of these issues is of prime importance, not only to the parties to this case but likewise to the residents of Bond Hill whose hopes of obtaining street car facilities are directly or indirectly at stake. Although appreciating this situation, such as I am led to infer it, yet I can not assume to pass upon questions not at issue upon the evidence presented. Upon the record, the proposed re-location of Reading road is not now an established street, and the precise form in which the city may hereafter act can not be foretold or the scope of its future legislation be assumed. A present expression of opinion upon these questions would consequently be without judicial sanction, and not binding upon this or any other court. Such expression would therefore be not merely useless, but doubtless, also improper.

A decree may be drawn in accordance with this opinion.

February 24th, 1915.